SOVEREIGN CAMP, W. O. W., v. ALSTON.
No. 1596.

Court of Civil Appeals of Texas. Waco.
April 25, 1935.

Rehearing Denied May 16, 1935.

Young, Stinchcomb & Kenley and Earl Sharp, all of Longview, for appellant.

M. H. Gibson and Cecil Storey, both of Longview, for appellee.

ALEXANDER, Justice.

This action was brought by J. E. Alston to recover on an insurance certificate in the sum of $1,000, issued by Sovereign Camp of the Woodmen of the World on the life of J. L. Adams, and payable to plaintiff as beneficiary. The case was tried before the court and judgment rendered for plaintiff. The defendant appealed.

The suit was defended on the ground that the policy had lapsed for the failure to pay monthly dues. J. L. Adams became a member of the fraternity and was issued a beneficiary certificate in the sum of $1,000 in December, 1904. There is no evidence to indicate that this certificate provided for any cash surrender, nonforfeiture, or other reserve value. He paid the dues, amounting to $1.55 per month, regularly as they matured to December 31, 1919. On that date the fraternity's constitution and by-laws were amended and the dues raised to $5.08 per month, but instead of paying at the increased rate, the insured elected to pay at the old rate of $1.55 per month and to have the difference charged as a lien against the benefits to be paid under his certificate. On April 1, 1929, this lien with accumulated interest amounted to $344.71. On that date he made application for and was granted the certificate here sued on, which is termed an "Ordinary-Whole Life Certificate," and is for the sum of $1,000, free of liens, and requires the payment of premiums at the rate of $6.66 per month. He defaulted in the payment of these premiums either in March, 1930, or January, 1932 (the exact date being immaterial), and died July 18, 1932, without having resumed payment of premiums. Upon the trial the fraternity contended that the certificate had lapsed for the failure to pay premiums, while the plaintiff contended that it was still in force by virtue of its automatic premium loan provisions.

On the first page of the certificate it was provided that the fraternity would pay the beneficiary $1,000 upon the death of the insured, or would pay a certain cash surrender value, advance automatic premium loans, or grant paid-up or extended insurance, under the conditions and in accordance with the provisions contained on page 2 of the policy, and concluded with the following provision: "The non-forfeiture value shall be computed as if this certificate had been issued on the 1st day of April, 1923. Issued at Omaha, Nebraska this 8th day of June 1929." The policy was on printed form, but the above dates were written in with a typewriter. Page 2 of the certificate contained the following material provisions:

"2. Cash Surrender, Loan Value, Paid-Up and Extended Insurance: After thirty-six monthly payments on this certificate shall have been made, should the member fail to pay any subsequent monthly payment, the member, within three months after due date of the monthly payment in default, but not later, upon written application and legal surrender of this certificate, may select one of the following nonforfeiture options:

"Option (a) The Cash Surrender Value set forth in Column 1 of Table A on page 3 hereof for the period to the end of which premiums have been paid in full.

"Option (b) A Paid-Up Certificate for the amount set forth in Column 2 of Table A on page 3 hereof for the period to the end of which premiums have been paid in full.

"Option (c) Extended Insurance from such due date, for the amount of the death benefit on page 1 hereof, but without Total and Permanent Disability Benefits, for the period specified in Column 3 of Table A on page 3 hereof for the period to the end of which premiums have been paid in full.

"3. Automatic Premium Loan: After thirty-six monthly payments on this certificate shall have been paid, if any subsequent monthly payment be not paid on or before its due date, and if the member has not, prior to such due date, selected one of the options available under the non-forfeiture provisions of this certificate, the Association will, without any action on the part of the member, advance as a loan to the said member the amount of the monthly payments required to maintain this certificate in force from month to month until such time as the accumulated loans, together with compound interest thereon at the rate of five per cent per annum, and any other indebtedness hereon to the Association, equal the cash value hereof at the date of default in the payment of the monthly payments."

The last paragraph on page 2 of the policy contained the following sentence: "The cash, loan, paid-up and extended insurance values shall not become available until three years from the date of issue, as set forth on page 1 hereof."

On page 3, under the heading, "Table A: Cash Surrender, Paid-up and Extended Insurance and Loan Values: Available in Accordance With the Provisions of this Certificate," was a table showing the values for the various purposes such as cash or loan value and paid-up or extended insurance for each year from and after the end of the third certificate year. The insured did not, within the time specified, select either of the options available under the nonforfeiture provisions contained in paragraph 2, and if the policy was kept alive, it was by virtue of the automatic premium loan provisions contained in paragraph 3, above set out. The plaintiff contends that the certificate is to be construed as though it had been issued on April 1, 1923, and all premiums or dues as paid thereon from that date up to the time the insured defaulted, either in March, 1930, or January, 1932, and if so, the values shown in the table on page 3 were sufficient to have kept the certificate in force under the automatic premium loan privilege provided for in paragraph 3, page 2, of the certificate, until the death of the insured. On the other hand, the defendant contends that under the provisions of the certificate the automatic premium loan privileges were not available until after thirty-six monthly premiums had been paid on the new certificate, and since the insured did not meet these requirements he was not entitled to such privileges, and as a consequence his policy by its own terms lapsed when he ceased to pay premiums.

■■ It is our duty to undertake to ascertain the intent of the parties from the language used by them in the contract. If that language leaves the meaning doubtful, we must give the insured the benefit of the doubt and construe the contract most strongly against the insurer. However, in ascertaining the meaning of the parties we must harmonize and give effect, if possible, to all of the provisions of the contract, and if, after having so harmonized and given effect to its provisions, the intent of the parties is clear, we must give effect thereto.

■ Paragraph 3 on page 2 of the policy contains the provision for automatic premium loans by which the policy was to be kept alive in the event the insured defaulted in the payment of premiums. Such privilege was not an unconditional grant but was a limited one. The very terms of that part of the contract creating the right placed a limitation thereon. If the insured was to obtain the benefit of the privilege therein granted, necessarily he was under obligation to comply with the conditions and limitations therein specified. By specific and unmistakeable language the benefits provided for in paragraph 3 were made available to the certificate holder only "after 36 monthly payments on *this certificate* shall have been paid." By the term "this certificate," as used in the foregoing sentence, is meant this particular written agreement. Language could hardly be clearer. With this provision standing alone, no one could be misled into the belief that he would have the right to depend on the automatic premium loan provided for therein to keep his policy alive unless and until he had made at least thirty-six monthly payments on the very certificate under which he was claiming. It is inconceivable that a holder of such a certificate should believe that he would have the right to have considered for this purpose payments theretofore made by him on another and prior certificate.

The appellee contends that the provision, contained on the first page of the policy, that "the non-forfeiture values shall be computed as if this certificate had been issued on the first day of April 1923," alters the case and requires us to consider the certificate for all purposes as though it had been issued on April 1, 1923, and as if all monthly payments had been made thereon from that date up to the time of final default, and that when this is done it will be found that more than thirty-six monthly payments had been made on the certificate, and therefore the insured was entitled to the benefit of the automatic premium loan privilege. We do not think that this provision has the effect contended for by appellee. This provision merely fixes the date to be used as a basis for *computing* the amount of the nonforfeiture values when they finally become available. It does not undertake to fix the date when such values should become *available*. Certainly it cannot be said that this general language affects and completely nullifies the more specific language used in the very sentence creating the right contended for herein,

wherein it is provided that the right shall accrue "after 36 monthly payments on *this certificate* shall have been paid."

Neither does the language used in the sentence hereinabove quoted from the last paragraph on page 2 of the policy alter the case. ·That sentence merely provides that the nonforfeiture values shall not become available until three years from the date of issue as set forth on page 1 of the certificate. In the first place, the certificate was actually issued on June 8, 1929, and by the terms of the sentence here under consideration, the loan values were not to become *available* until three years from the date' of issue. It is true that for certain purposes the certificate was to be considered as if issued on the 1st of April, 1923; but, as said before, this was only for the purpose of *computing* the amount of the nonforfeiture values when they would finally become available and not for the purpose of determining when they would become *available* for the purpose of preventing a forfeiture. In the second place, the language used in this sentence is in the negative, and instead of creating rights or accelerating the maturity of those elsewhere provided for, rather evidences an intention to limit or retard the maturity of such rights. It could hardly be said that the fraternity, by the use of such language, intended to nullify the conditions or limitations provided for in paragraph 3, and to make such loan privileges available *before* instead of "*after* 36 monthly payments on this certificate shall have been paid."

Our construction of the certificate is further borne out by the provisions of the application for the new certificate which, it is conceded by all parties, constituted a part of the contract. These provisions are in part as follows:

"The new certificate is to become effective on the first day of April 1929, and to bear the date of April 1, 1923, and age of 63.

"It is understood and agreed that withdrawal values, if any, on the new certificate will be available to me only after I have made payments on said new certificate for three full years from date thereof.

"First payment on new certificate is for the month of April 1929 * * *."

These provisions of the application make it clear that the withdrawal values, which necessarily were the funds to which resort was to be had to keep the policy alive in the event of a default, were to be available only after the insured had made payments on the *new certificate* for three full years from date thereof. All doubt as to when the count should begin for the purpose of ascertaining whether or not the insured had made payments on the *new certificate* for three full years was removed by the provision that the "first payment on the new certificate is for the ·month of April 1929." This provision excludes the idea that any payments made on the old certificate prior to April, 1929, should be considered in determining whether or not the insured had made a sufficient number of payments to entitle him to the benefit of the withdrawal values for the purpose of keeping his certificate alive, and renders it clear that in determining whether or not the insured had made payments on the new certificate for three full years, the first payment to be counted should be the one made in April, 1929.

The courts of other states have considered contracts substantially the same as this one in the cases of Daly v. Sovereign Camp, W. O. W., 226 Mo. App. 629, 44 S. W.(2d) 229; Cain v. Sovereign Camp, W. O. W. (Mo. App.) 74 S.W.(2d) 865; Higgins v. Sovereign Camp, W. O. W., 224 Ala. 644, 141 So. 562; Sovereign Camp, W. O. W. v. Batty, 227 Ala. 50, 148 So. 811; Sovereign Camp, W. O. W. v. Hardee, 188 Ark. 542, 66 S.W.(2d) 648, and have held differently from what we have held; but we are unable to agree with the holdings of those courts. We agree with the dissenting opinion of Associate Justice Brown in the case of Sovereign Camp, W. O. W. v. Batty, supra.

The judgment of the trial court is reversed, and judgment here rendered denying plaintiff any recovery herein.